**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 07-335-001-PHX-NVW |
| Plaintiff, | ) ) | **FINDINGS OF FACT** |
| vs. | ) ) | **and** **CONCLUSIONS OF LAW** |
| Iordan Drezov, et al., | ) ) ) | |
| Defendant. | ) ) ) | |

The Government seeks forfeiture of property located at 14254 North 46th Place, Phoenix, Arizona ("the Phoenix Property"). In a previous order, it was held that the Phoenix Property was subject to forfeiture under 21 U.S.C. § 853, that Defendant Iordan Drezov ("Iordan") had an interest in the Phoenix Property, and that the Government established the requisite nexus between the Phoenix Property and the offenses. (Doc. # 30.) Petitioner Mitko Mitov ("Mitov"), Iordan's uncle, has asserted an interest in the Phoenix Property that is exempt from forfeiture. (Doc. # 37.) The Government's motion for summary judgment as to Mitov was denied. (Doc. # 85.) A bench trial was held on March 19, 2009, and the Court now makes its findings of fact and conclusions of law. Because Mitov's own testimony was not credible in light of the undisputed facts, and because proof of ownership hinged on this testimony, Mitov has failed to show the dominion and control necessary to defeat forfeiture. Judgment will be entered for the Government.

1 **I. Findings of Fact**

The facts of this case developed over a period of many years, but a recent phone conversation sheds light on the whole story. On December 27, 2006, the Government intercepted and recorded a telephone conversation between Mitov and his nephew Mario Drezov ("Mario"). The two discussed a variety of subjects, mostly related to family matters. One of those matters was the ownership of the property at issue in this case. Referring to Iordan, Mitov stated, "It is his house, but it is titled in my name. If they look for the signature, they'll look for me." After being told of Iordan's "unclean" dealings, he stated, "I have nothing to do with it . . . . He just titled it [in my name] so we can—in a cases [sic] like that—to be okay, you know . . . . I have no claims at all against this house. It is his house—let him do whatever he wants." The Court finds that this conversation is persuasive in its candor, and it undermines Mitov's subsequent testimony regarding his exercise of dominion and control.

Mitov was born in Bulgaria and became a naturalized citizen of this country in the year 2000. For several years before that date, he owned and operated an import/export business with dealings in Los Angeles. Mitov lived in Bulgaria and knew the business in that country; his partner Vassil Loutchev ("Loutchev") handled the American side of the business dealings including its day-to-day financial operations.

Mitov's nephew Iordan entered the United States in 1992 and received employment authorization from the Immigration and Naturalization Service ("INS") in 1996. In October 1998, the INS approved an extension of this authorization.

Earlier, in May of that same year, Mitov purchased the Phoenix Property in his own name. He did not visit the Phoenix Property at the time of purchase but viewed pictures of it. Because Mitov was in Bulgaria and was unfamiliar with American business formalities, he appointed Loutchev as his attorney-in-fact. Loutchev handled the administrative details of purchasing the Phoenix Property, and he also drew a $60,000 cashier's check bearing his own name for the down payment. The $182,250 balance of the purchase price was financed

with a mortgage. The Phoenix Property carries a 30-year mortgage with an 8.75% interest rate and has never been refinanced.

In 2002, Mitov reincorporated his business in Nevada and purchased a home there ("the Las Vegas Property"). Again, Loutchev handled the purchase process. Mitov has used the Las Vegas Property as a home and refinanced it twice to take advantage of more favorable interest rates, which he never did on the Phoenix Property.

Mitov did not move into the Phoenix Property. In fact, he never lived in the Phoenix Property at all. He visited the Phoenix Property on occasion, but Iordan is the only inhabitant whose presence has been established by a preponderance of the evidence. Iordan listed the Phoenix Property's address as his own address on immigration papers filed with the INS in 1998, though Mitov testified that Iordan only started living in the house in 2005. Mitov testified that the Phoenix Property was rented out to various parties over the years, but Mitov presented no evidence of rental activity aside from his own testimony: no tenant names, no lease agreements, and no rent checks. Mitov's CPA-prepared personal and corporate income tax returns for the years 1998-2000 show no rental income, depreciation deductions, or mortgage interest deductions for the Phoenix Property, strongly suggesting that he never told his accountants that he owned it.[1]

Mitov also testified that he remained financially responsible for all mortgage and utility payments, but he presented no records of payment for any such items predating Iordan's indictment in March 2007. He claims only that unpaid utility bills impacted his credit rating. All utility and mortgage bills related to the Phoenix Property were mailed to the Phoenix Property. The mortgage payments for the property were made with money orders. In September 2000, the mortgage company mailed an escrow refund check to the property, which was never cashed.

---

[1] Further undermining Mitov's credibility, the personal tax returns show a "single" filing status despite the fact that Mitov was married at all relevant times.

In February 2002, Mitov signed a deed conveying the property to himself and Iordan as joint tenants with right of survivorship. In written answers to interrogatories, Mitov stated that he intended for this deed to enable Iordan to convey the house to Mitov's family at Mitov's death. At trial, however, Mitov testified that he was taken advantage of when he signed the deed and meant only to give Iordan authority to rent the property.

There is little indication of where the $60,000 down payment came from. Mitov testified that $37,000 came from his business and $23,000 came from his personal funds. A statement for the business bank account shows that $38,000 was withdrawn in the days prior to the closing. Aside from the business account statement, the only evidence presented as to the source of the down payment funds is Mitov's own testimony. Mitov failed to produce any other financial statements, cancelled checks, correspondence, or other documentation regarding the origin of this substantial down payment. Both Mitov and Loutchev testified that while only they had the power to draw on the business account, other parties had the power to make deposits.

Mitov's testimony is the primary evidence he offers, but that testimony is not credible. As recently as December 2006, Mitov admitted to Mario that he did not hold any real interest in the house. In testimony, he tried to explain away this fact, arguing that Mario and Iordan were not getting along and that he sought to persuade Mario that only Iordan could live there. This claim was contradicted by the testimony of Sgt. Britt, the FBI officer who worked with Mario as an informant. Sgt. Britt testified that in the course of a six-month investigation, he observed Mario interact with Iordan 5-7 times and that he observed no hostility between them. In fact, when Iordan was arrested, Iordan's wife called Mario for advice. Mario had no incentive to move in with Iordan, and he never mentioned a desire to do so; the FBI was paying Mario's rent. For these reasons, the Court finds that the conversation between Mitov and Mario is what it sounds like: an admission that Mitov did not regard the Phoenix Property as his own.

Mitov similarly fails to explain the other evidence against his exercise of dominion and control. He does not deny that he has never lived in the Phoenix Property. He claims that

it was rented, but he presents no evidence of any tenancy or property management. He claims that he paid mortgage and utility bills, but he submits no substantiating documentation prior to the creation of the Government's forfeiture interest. He claims he was misled into conferring an undivided half interest and right of survivorship on Iordan, even though Mitov took great care to utilize his English-speaking partner Loutchev in other U.S.-based property transactions. He also offered two different sworn explanations for this action, as explained above.

In light of these facts, Mitov's testimony is unworthy of belief and the Court does not believe it. Therefore, the Court also rejects Mitov's claim that he, rather than Iordan, bore the economic burden of the down payment on the property. Mitov's testimony on this point is not credible and does not support a finding that he ultimately provided the funds. Nor does the single business account statement provide meaningful corroboration for his testimony. To the contrary, this ten-year-old bank statement further undermines Mitov's testimony because it suggests that other bank statements from the relevant period were available but not produced, statements that might cast light on the origin of these funds. The Court finds that Mitov has not established by a preponderance of the evidence that he was the source of the down payment funds.

**II.      Conclusions of Law**

To prevail in a criminal forfeiture proceeding, a third party who acquired the subject property prior to the time it became subject to forfeiture must show by a preponderance of the evidence that he had a vested right at the time of the commission of the acts giving rise to the forfeiture. 21 U.S.C. § 853(n)(6). Under Arizona law, applicable here, one must show "dominion and control" to show ownership; bare legal title will not suffice. *See In re One Residence Located at 4030 W. Avocado, Cortaro Ridge, Lot 32*, 184 Ariz. 219, 222, 908 P.2d 33, 36 (Ariz. App. 1995); *United States v. Nava*, 404 F.3d 1119, 1127-28 (9th Cir. 2005) (applying state law to determine third-party interest in property subject to forfeiture).

Mitov has not carried his burden. As the findings above indicate, Mitov has failed to show that he provided the $60,000 down payment on the house, that he made the mortgage

and maintenance payments prior to the arrest of his nephew, or that he originally intended to use the Property himself. To call Mitov cavalier toward the Phoenix Property would be an understatement. He did not avail himself of any of its financial or practical benefits. He did not saddle himself with its burdens. He paid no attention to property management, even ignoring an escrow refund check mailed to the house, and had virtually nothing to do with the purchase. Mitov's contrary testimony is not credible. The limited documentation he produced does not overcome the overwhelming circumstantial indications—as well as Mitov's own admission in the intercepted phone call—that Mitov exercised no dominion and control. His failure to show the economic source of the $60,000 down payment is more consistent with money laundering than it is with ownership. The Court finds that Mitov never intended to exercise ownership, but only to elude possible forfeiture actions arising out of any misdeeds Iordan might commit.

Aside from the fact that no credible evidence supported it, there is no relevance to Mitov's contention that unpaid utility bills for the Phoenix Property affected his credit rating. Mere responsibility for payments is not a substitute for the payments themselves. *See One Residence*, 184 Ariz. at 222, 908 P.2d at 36. Nor is there relevance to Mitov's claim that he spent money on the property after Iordan's arrest. These expenditures do nothing to bolster Mitov's claim of ownership because they arise subsequent to "the commission of the acts which gave rise to the forfeiture." 21 U.S.C. § 853(n)(6). Likewise, the conveyances that took place subsequent to the indictment do not alter the conclusion here. Mitov does not contend that he was a bona fide purchaser for value after that date.

Mitov's third-party challenge to the forfeiture therefore fails on the merits. The Government is entitled to judgment that it owns the Phoenix Property free of the adverse claims of Claimant Mitko Mitov. The Government may submit a form of judgment by April 17, 2009.

DATED this 2nd day of April, 2009.

_____
Neil V. Wake
United States District Judge